When the lawyers are ready, we're happy to hear argument in our second case, number 146411, Incumaa v. Stirling. Stephen Goldblatt My name is Stephen Goldblatt. I'm a professor at Georgetown University Law Center, and I was assigned in this case to represent Mr. Incumaa. With the court's permission, argument today will be presented by Emily K. Murky, a third-year law student at the Law Center, who is appearing in conformity with the rules of this court and with the consent of our client. Emily K. Murky That would be great. Glad to see you again, Mr. Goldblatt. Mr. Incumaa has spent nearly 20 years in solitary confinement, and he could remain there indefinitely, solely because he will not renounce his religion. Because genuine issues of material fact remain on this record, summary judgment should be reversed for three reasons. First, Mr. Incumaa has a clear liberty interest in avoiding such restrictive confinement, and his conditions are atypically harsh compared to this circuit's baseline. Second, given Mr. Incumaa's liberty interest, genuine issues remain as to whether he is receiving the process he is due, meaningful, ongoing, and individualized review of the need for his continued segregation. The mere fact of his participation in a prison riot 20 years ago is simply not enough. And third, under RLUIPA, prison officials' evidence falls far short of showing that asking Mr. Incumaa to renounce his religion is the least restrictive means of achieving any security interests, particularly when the majority of the Nation of Gods and Earths are already in the general population. The District Court failed to find a liberty interest, assuming that renunciation somehow mitigated the indefiniteness of Mr. Incumaa's confinement. Respectfully, that is wrong. Well, renunciation isn't the only way, the only relief. Your brief seems to assume that, and that isn't the case, is it? Well, prison officials allege that there are three ways that Mr. Incumaa could get out of SMU. The first is through classification review, the second through enunciation of his religion, and the third through removal of the STG label. And they've refused to remove the STG label. And Mr. Incumaa has argued, and we're arguing, that effectively the first two options are collapsed into each other because prison officials are making it clear that he will not receive meaningful review unless and until he renounces his religion. How many other folks in his group, religion, have been put back into the ordinary prison population? We don't have information on this record about... How many people remain in this solitary confinement? It's unclear from the record. Mr. Incumaa, prison officials have presented no evidence on that. Mr. Incumaa believes there are two. Right. Mr. Incumaa believes there are two. He believes there are two, but he's not sure. But the majority, prison officials have admitted the majority of members are in the general population. Well, then the answer to my question is yes, they're in the general population. That's what I just said to you. And you said we don't have any information about whether they're in the general prison population. And I said how many are in solitary? And you said we think two. The rest are in the general prison population. We think the majority, they say the majority are in the general population. It would seem to me that there's something other than religion that got them there, than renunciation of religion. In fact, the majority were never in solitary. They were initially classified in general population. And the record and the regulations indicate that the difference is not the religious affiliation, but the actions of the appellant, the violence and the threat that this particular appellant carries with him. Yes, Your Honor. Well, to address your first point, in 1995, or I believe it was 1995 when SCDC originally classified the Nation of Gods and Earths as an STG. And at that point, all the verified members were moved to SMU. And they're alleging that since that time, it's no longer been necessary for them to keep the members of Nation of Gods and Earths in segregation. And they've moved many of them to the general population. And I think that only strengthens our argument that at this point, prison officials have not shown that the group continues to be violent. And for purposes of due process, they've also not shown that Mr. Nkuma himself is violent. He's been in solitary confinement, infraction-free, for almost two decades. Well, couldn't that be in large part by virtue of the terms under which he's being held? How can he commit infractions if they're strip-searching him every time he leaves his cell? I mean, it's kind of a two-edged sword. I understand that you're arguing that's a restriction of liberty interest, but it certainly suggests why he hasn't committed any other infractions, doesn't it? I don't think so, Your Honor, because the prison's own policy accounts for inmates' behavior in SMU to consider release under SCDC policy 2212. And there are several infractions that inmates could commit while in solitary, behavior towards prison guards and other prison staff. Well, then let's get to the liberty interest issue here, because it seems to me that's pretty fundamental to your analysis. Yes, Your Honor. What is the difference, if any, in the liberty interest analysis when the classification is based on punitive and disciplinary considerations as opposed to simply being in there for having committed a crime? Well, first of all, this is not ordinary administrative segregation. I think it's clear from the record that Mr. Nkuma's 20 years in solitary confinement is not the average case. Right, but I'm trying to get a handle on how the liberty interest analysis shifts, if it does at all, based on the fact that he's there because of his conduct, not because of an ordinary custodial classification based on the crime that he committed that got him to the penitentiary. I think that the Supreme Court's decision in Stanton suggests that there's not much meaningful distinction between administrative and disciplinary segregation, which I think is what you're referencing. And also, I think it bears pointing out that the Wilkinson Court, Wilkinson v. Austin, another seminal Supreme Court due process case, was dealing with members of the Crips there, actually, who had either through some sort of conduct while in prison been considered for reclassification to the maximum security unit. And that did not affect the liberty interest analysis in Wilkinson, and I don't think it should here either. So you're saying your answer, then, is it's the same? It's substantially the same analysis looking under Wilkinson at the totality of the circumstances of the inmate's confinement, which here are extraordinarily harsh, and also looking to whether that confinement could be indefinite. And prison officials have stated that Mr. Nkuma, his renunciation might never be accepted. Because of his earlier participation in the prison riot, they might never accept a renunciation of his religion as sincere. And because we don't believe he's receiving meaningful ongoing classification review, that leaves him with essentially no way out. But the real basis of your argument, in a few very short sentences, this man's been in 20 years, and you don't think he's ever gotten any real review, and that's what you want? Yes, Your Honor. You're not entitled to anything more than that, surely? No, Your Honor, we're not. And I have a question to ask you about that. Because the Supreme Court doesn't seem to have ever told us. They've told us what you don't need. You don't have to have a hearing. You don't have to see the person face-to-face. You don't have to have any elaborate thing in writing. You do. They don't even say you have to have anything in writing. Here there was something in writing. So where do we gather what is required in this process that he was not, you say, wasn't given? Where do we find a guideline for that? Well, I think there's some helpful language from Wilkinson, which stated, quote, requiring officials to provide a brief summary of the factual basis for classification review and allowing the inmate a rebuttal opportunity, end quote, are, quote, among the most important procedural mechanisms for purposes of avoiding erroneous deprivation. Well, but did the Ohio statute have that by the time that the Wilkinson court decided the case? I think they were talking about what existed, and then they said the process was sufficient. Remember? The process was sufficient because it was a very comprehensive, three-tiered annual review where the inmate did have an opportunity for rebuttal. So does this only have to be annually? I mean, we don't even know that. I mean, 20 years does seem like a long time to just get every month someone signing off. Right. But what I'm looking for is yearly, if they wrote this brief thing and gave it to the inmate and let him have a chance to come back, that would be sufficient? I think what's missing from this record, Your Honor, is sufficient notice of the reasons they're keeping him in confinement and the opportunity for rebuttal, which, as you stated, under the Supreme Court's precedent, does not need to be a formal type of hearing. In the prison context, it's taken into account that it's a burden on prisons to have very formalized procedures, but at least some opportunity to respond to the reasons keeping him in confinement. So how often do they have to do that? I think under Wilkinson, annual review would be sufficient if it were meaningful review. I mean, arguably, he's getting more review now. He's getting monthly review. It's not as elaborate as what they talked about in Wilkinson. Actually, I've looked at a lot of records in my life, and it looks to me like they actually do make a review. Somebody comes in every month. It isn't signed for the year and then lined up. It's a monthly visit, too. It's not just a review. They must visit him. That's what it says. You're correct, Your Honor. Under the classification review policy, that's what's supposed to happen. And also under the classification review policy… Did he maintain that they didn't? There is a genuine issue on this record. He's presented unrebutted evidence that he's never been visited by anyone, and there's no documentation on the single-line log entries of who visited him, and the entries themselves are very cursory. The only substantive entry states that he will not renounce his religion. Or that he remains classified as a threat. It doesn't just say, will not renounce his religion. It states STG, SD, and that's pretty much it. Word review and ICC classification review. But on that point, I want to jump to the RLUIPA analysis because I think that that's an important part of his claim. There's clearly, I think, on this record, as the district court correctly assumed, a substantial burden on Mr. Nkuma's religious practice, created by the Hobson's choice that he's essentially faced with. Religious liberty in SMU or… Well, you're assuming this is a religion. The district court didn't find that, right? They assumed it was a religion for purposes of summary judgment. And under this circuit's precedent, I believe that was appropriate because this court in Coward v. Jabe made clear that an evidentiary hearing would be necessary to do an individualized assessment of an inmate's religious practice to find that his religion was not sincere. And that has not happened. And so I think for purposes of summary judgment, we have to assume it is sincere. And the prison has not met the strict scrutiny burden under RLUIPA. As this court recently stated in Holt v. Hobbs, a Supreme Court case that came out in January, the RLUIPA standard is, quote, exceptionally demanding. And prison officials have tried to rely on First Circuit, First Amendment precedent to show that they should get deference in considering the alternatives available to them. But under Holt v. Hobbs, they have not adequately considered lesser restrictive alternatives. And I think that the record is clear that there is an obvious lesser restrictive alternative here, which is to ask Mr. Nkuma to renounce any current dangerousness or violence. And that's something that other prison systems in this circuit have done. The West Virginia prison system has a renunciation process where the inmate can renounce violence. And I think that would be a much better way of getting at the prison's security interests without burdening Mr. Nkuma's religion. And the prison also has failed to demonstrate that the renunciation of Mr. Nkuma's religion furthers a compelling government interest in several ways. First, they have not tied the nation of gods and earths to any current violence in the SCDC prison system. They have not shown that. In fact, they state that the nation of gods and earths, the incidence of violence has decreased since the Five Percenters decision in 1999. What about the degree of violence? I mean, that was a pretty stunning display of violence when they did, in fact, engage in it, taking hostages, assaulting, using weapons. So isn't that something that the prison officials are entitled to consider, notwithstanding the passage of time? I think the passage of time is important, Your Honor, especially in light of the fact that Mr. Nkuma has argued that Right, I agree with you. Passage of time is important. But my question was, isn't this also the nature of the violence, the extent of it, the fact that it was directed at the prison authorities? Isn't that something that nevertheless survives to some degree in the analysis, notwithstanding the passage of time? Certainly to some degree, Your Honor. And we're not challenging the fact that prisons do have security interests in maintaining safety and security of prisons. However, Mr. Nkuma has argued that the riot itself was not in keeping with the tenets of his religion, and that, in fact, was against his religion. And I think that his individual behavior in SMU for the last 20 years, where he has been infraction-free, demonstrates that, at least as applied to him, which is important under RLUIPA, his religion does not teach violence. And so there needs to be some sort of matchup between the religion itself and the propensity for violence or the threat of violence. And prison officials have not presented adequate evidence on this record to establish that for purposes of summary judgment, to establish that their policy furthers a compelling interest. I spent a lot of time in your brief on that, too. I think that was the only argument you had. I don't know about that. But talk to me about the least restrictive alternative. Yes, Your Honor. The least restrictive means. I don't know why you didn't talk about that. I think I'm out of time. All right. We'll talk about it on rebuttal then. Okay. Okay. I just wanted to. All right. Thank you. Excuse me. May it please the Court, my name is Andrew Lindeman. I represent current SEDC Director Brian Sterling, who was substituted in the District Court as the defendant and now is the appellee in this matter. I believe the overarching theme, the overarching argument that has been made by Mr. Nkuma and his counsel is an essence that 20 years has passed since the 1995 riot which resulted in Mr. Nkuma first being put into segregation in the maximum security unit and ultimately I think in 2006 being moved to the special management unit but still remaining in segregation, that that gives rise to an argument that he no longer belongs in segregation. And in essence, what I think that boils down to is a claim that hasn't been pled and a claim that hasn't been argued, and that is whether or not this is some sort of disproportionate punishment. In fact, it pervades. I'm sure you're familiar with because of your client. There have been a slew of cases involving lengthy terms, some of them not as lengthy as this, that have spawned due process claims. That is correct. So it hasn't been just segregated, if you will, to Eighth Amendment claims. Well, that's true. But I think part of the real argument, first of all, they repeatedly throughout their briefs argue that this is punishment and that they fail to recognize that there's a distinction between disciplinary segregation, which this is not, and security detention, which is what this is. Yeah, but you can make sure that the court understands that. Sure. I recognize that. But we still have the 20 years. And that's true. And really what triggered this thought in my mind is this Court's decision from a few weeks ago in Pareto where the court actually, and Judge Motz, I know you wrote the opinion, makes the exact point that in essence, in fact the court said Pareto's approach would collapse a prison conditions due process claim into an Eighth Amendment claim and goes forward and makes this exact same point. This man does. The state concedes it. He does have a right to process. Well, we haven't conceded it. In fact, the district court found that there was no liberty interest. I mean, that's an all. It's a 30-day review. Aren't you conceding that that is something that he's entitled to? As an alternative position, we have shown that if this does give rise to a liberty interest, he is receiving sufficient process under the Supreme Court's precedent, Hewitt v. Helms and the Wilkinson v. Austin case. You're not claiming that there's no state statute or regulation here in the situation that was in Pareto. You're not making that claim? No, there's no specific statute that says he has to be, you know, based upon his conviction for murder, he has to be held in security detention. No, no, no, that's not what I'm asking. You're right. That's correct, too. Which is the equivalent of, would be the equivalent of what you dealt with in Pareto. That is one element of Pareto, but another element was that there was nothing in the state statute regulations or anything that ever gave him any right to a hearing. It was because of the sentence, to be sure. But here, this man does have a right to some sort of review under the state's own regulation. But that's without any type of acknowledgment, of course, that there's a liberty interest. Those protections have been built in. Whoa, whoa, whoa, whoa, but your claim about no liberty interest is only because you don't think that this is severe to the first element, but it doesn't go to the fact that there is no state regulation. It's just not the same situation as Pareto. Well, as far as the first prong of the due process analysis, I agree with you on that. Right. Okay, and then on the second prong of the Sandin analysis, quite honestly, you know, in Pareto it's definitely a welcome precedent in this circuit because all we've had in the past is Bevarati, which really doesn't establish what the baseline is for even determining the second prong of Sandin, as this court indicated. I didn't hear any argument from the state that Bevarati didn't apply the baseline here. It wasn't the baseline here. You were perfectly happy with that being the baseline. Well, the district court decided it based upon using Bevarati as the baseline. Did you advance a different argument here? Did not advance a different argument to this point, of course. It seems to me that's your argument. We, of course, didn't have the benefit of Pareto, which suggests that there may be a different baseline that's asserted in a case such as this, as this court distinguished in Pareto that Bevarati dealt with disciplinary detention and not any other type of scenario. But besides that, I mean, if you get to the issue of due process, even if the court finds a liberty interest, and we believe the district court's analysis of that issue is absolutely correct by looking at whether or not there is atypical and significant hardships, even using the baseline from Bevarati of the general prison population. The analysis relying on the circumstances in Bevarati, relying on the circumstances in Wilkinson, I believe that Judge Norton's analysis is absolutely appropriate. When you're talking about the severity, this 20 years does make this different. I mean, there's just no... I mean, 20 years, the duration is an element, but it's also... 20 years in solitary confinement. There are no... In an overriding consideration. That's a heck of a long time. I mean, doesn't it really come down to whether you're providing him any kind of meaningful review? I mean, 20 years is... As far as the due process claim goes, I think that that's right. Doesn't your case rise or fall on how much review you're giving? And you might be able to give, without much ado, enough review to meet the due process. Does this record establish that? With all due respect, I'm not conceding the liberty interest analysis. I think Judge Norton made a proper analysis relying on the precedent that's available, Wilkinson and Bevarati. But as an alternative position, as we argue in our brief, even if there is a liberty interest, due process is provided, and certainly using Wilkinson as the guide there. How is it being provided here? Well, it's being provided in several different ways. Number one, there's an ICC review every 30 months. 30 days? I mean, 30 days.  30 days. And do we know what that constitutes based on this record? That constitutes a review of the classification status. Now, by policy, that is... Who does it? What do they look at? Do they consult people? Do they consult his guards? Do they talk to him? Yeah, and what about the appellant's argument that there's an issue of fact here because he says they didn't talk to him, they don't talk to him or give him any opportunity for rebuttal? Well, by policy, and of course this is a facial challenge, this is not a suit against any type of individual. It's a suit against the current director who actually wasn't even a director when all this occurred. It's an injunctive relief claim only. And I think that's important to recognize. I also think it's very important to recognize something that Mr. Nkuma's counsel has not recognized in their briefs is the burden of proof on the due process claim was the plaintiff's burden of proof. So the absence of any evidence in this record doesn't fall on the defendant. In fact, I was quite taken aback in the reply brief that a complete violation of Silatech's rule, the argument was that we didn't negate his allegations. Well, clearly at summary judgment, there's no burden on the part of the non-moving party. You're saying it's his burden to prove the process that you go through. That's correct. And the burden of him to prove that the process is not adequate. And how would he go about doing that in the context of this lawsuit? He could do it through discovery. I mean, there was absolutely no written discovery has been provided. And quite frankly, that wasn't the focus. I mean, I think if you look back at the way this case was litigated in the lower court, it was litigated primarily as a RLUIPA claim with this whole premise that he's being forced to renounce. But since we're now talking about the due process claim, you put up an affidavit, and it's your submission to us that he can't just say the affidavit's insufficient. He must disprove the affidavit for purposes of summary judgment? I've never heard of such a law. No, that's not what I'm suggesting at all. If the affidavit doesn't set forth sufficient process, then you lose. It does show sufficient process. I understand that's your submission, but if we should conclude that it's a matter of law, the affidavit, and the affidavit is pretty general and pretty small, but it doesn't set forth sufficient process. What the affidavit reflects, and this is in response to the way this claim was brought, again, it wasn't brought as an individual claim saying he was denied due process by any particular classification worker who didn't follow policy. What we have established, because this is a facial challenge, is, number one, what the policy requires, and whether or not that was violated or not is not the issue. It's whether or not what the policy is in a facial challenge, what the policy is, whether that meets the constitutional minimums set by Supreme Court's case law in Hewitt v. Helms and the Wilkinson v. Austin case. And number two, we have showed that he is receiving those 30-day notices, I mean those 30-day reviews, not only by the ICC but also by the ward. And then there's a third aspect to this. I'm looking at the three-paragraph, one-and-a-half-page affidavit here, and it says his custody status is reviewed by SMU Classification Committee Review Board at Lieber Correctional Institution. Do we have a state regulation or state policy in the record that tells us what's involved? The classification policy is in the record, starting at page 134, is the Special Management Unit policy, and within that policy there are provisions regarding security detention and the review that is required. If you turn to page 138 of the joint appendix, it provides a section called required reviews. And that shows what the policy requires. Now, whether or not a specific institutional caseworker is providing that or not is not the dispositive issue in this particular case. The issue is whether this is to fit this and this three-sentence affidavit are sufficient to demonstrate that he's getting due process. And there's a third factor that needs to be considered as well. This policy also indicates at paragraph 2.2.4, which is on the preceding page, 137, that under the section under security detention, inmates may appeal the decision of the ICC through the inmate grievance system. And that's very important. And we made that point in our brief, and in reply they suggested that that was an argument that somehow PLRA exhaustion was not accomplished in this case. And that was not the point at all. The point was that if he's not satisfied with the procedures and he's not satisfied with the decision of the ICC, he has the grievance rights to appeal that. And what's significant under South Carolina law, and we didn't touch on this probably in as much detail in my brief as I should have, maybe I should have done a sir reply, but the bottom line is through the grievance procedures, there's two steps to South Carolina grievance procedure, and that's well stated in case law from the District Court of South Carolina. But what's important there is if it involves a liberty interest, the South Carolina Supreme Court some 15 years ago now adopted, in a case called El Shabazz v. State, a process whereby if there is a liberty interest or a property interest implicated by that grievance, there is also appeal rights then to the South Carolina Administrative Law Court and from the Administrative Law Court on to the South Carolina Appellate Courts. So there is indeed some substantial procedure and process that's in place for someone who wants to challenge their classification status and custody reviews. Now, what's important to recognize in this case is this is far beyond what was even addressed in Wilkinson. I mean, Wilkinson made the very point that there is no hearing that's required, there's no adversarial process. In fact, in the reply brief they said, they made the point the Department of Corrections hasn't produced in this case any transcripts of any hearings. What we, no type of transcript or hearing is required. In your most recent argument you said that what South Carolina, I thought you said what South Carolina provides is a great deal more than what Ohio provided in Wilkinson. Is that your submission? If there is a liberty interest involved, there is the ability to go beyond the grievance procedure. I really am, I want to hear your explanation. I'm sorry. I want to hear what your answer to that question is. You're telling us that this equals more than what Ohio provided under its new rules in Wilkinson? I believe so, Your Honor. If it didn't provide as much, then Wilkinson wouldn't be much of a precedent for you on that point, would it? Well, no. And there's very little information actually in Wilkinson, in all fairness, as to the subsequent reviews that are available after someone is placed in the Supermax facility. What did you tell us was pretty elaborate? Well, and really what Wilkinson focused on is the initial placement of the individual into Supermax. And what this case involves is not the initial placement, because that happened back in 1996 and is not challenged. What this case involves is the current procedures, which is long after the initial placement and segregation. So there is a significant difference. Now, the opinion doesn't go into great detail as to what the review is subsequent to the initial placement. What it talks about is annual reviews. I don't want you to be bogged down if you want to make a loopy argument. Oh, thank you, Your Honor. I mean, my colleagues may have more questions on the due process argument, but, you know, in the amount of time. And essentially to sum up that point, even if this Court finds there's a liberty interest implicated, we do believe that the due process that's provided by policy in a facial challenge is more than adequate and meets constitutional minimums. Now, turning to the RLUIPA question, what is difficult to grasp in this case, I believe, is that this whole idea of renunciation. Now, the Department of Corrections does not recognize the five percenters, Nation of Gods and Earths, as a religion. Now, recognize that the courts, to avoid that issue, have always assumed that it's a religion, and that issue hasn't been specifically decided within this circuit. But even if you assume it's a religion, you have to understand the STG policy, which allows for a gang member to renounce his affiliation with a gang, is not directed at religious beliefs. It's directed, it's an opportunity for someone who is a member of a gang to basically renounce his affiliation with that gang and essentially be able to have his STG validated status lifted. But importantly, that is only one mechanism in place, and that is significant, one mechanism in place to be able to challenge your STG designation. Now, what's key in this particular case is there is no impetus on Mr. Nkuma to renounce his involvement and affiliation with the five percenters. That is not what's holding him in security detention. Clearly, it's his conduct in the past that is holding him in that capacity, and the reason that's clear is because a majority of five percenters are not in security detention. And what is significant, and this also goes to the whole issue of the least restrictive alternatives, as Judge Norton found, when this policy was first implemented in 1996, after the riot that Mr. Nkuma and others were involved in, what occurred was anyone who was validated as a member of a gang, including the five percenters, were automatically moved to security detention. They were put in administrative segregation. That was challenged by a number of inmates under First Amendment grounds, and we have the landmark case from this Court from 1998, the in-rate long-term segregation of five percenters case. But what is significant is the South Carolina Department of Corrections changed their policy, and they changed their policy to make it less restrictive. And what they did was— But the question about least restrictive alternative is not, well, the alternative that we're giving him now is better than the alternative that we originally gave him. You're required to meet this incredibly difficult standard, but the least restrictive alternative. That's right. And you can't just set up three straw men and say, well, we've offered this one, so we're giving him that, and these other two are impossible. And that demonstrates least restrictive alternative. Well, I mean, what this Court requires to the Couch case is that you show that you considered alternatives and why they were rejected, and we have provided that information through the affidavit of Robert Ward. And that's all that's necessary for a state to demonstrate least restrictive alternative, to come up with some alternatives and show why they were rejected? Well, in addition to that, have to show that there is no alternative, least restrictive alternative. And there has been none that has been shown in this particular case. But it's not his burden to come up with one. It's your burden to show there is none. That's correct. And I believe that we have shown that because, as Judge Norton found in the district court, we have shown that we have actually gone the additional step, something you don't typically see in RLUIPA cases, of recognizing a way to make it least restrictive and implement it. And that's the point that I was trying to make, that in essence, as opposed to the way the policy was originally implemented, where all STG-validated inmates were then put into security detention, that's not the way it works anymore. And instead, it is only those inmates with a history of the type of violent behavior that you have, in this particular case with Mr. Nkuma, that are put in security detention. Correct me, because I'm sure you have a better understanding of the record. But his RLUIPA claim is that he wants to pray with others four times a year, four holy days. Is that what you gather? Well, that was actually added very late in the case. But, yeah, he has not been able to participate in the honor days, as he says. And those are four days a year. So is there a possibility that you could have four cells that were separated from each other and monitored, and so they could pray together? That would be, it seems to me, a less restrictive alternative than not giving them any access to anyone. This is assuming, of course, that this is a religion. Right. And it's sort of difficult for me to answer that, because this whole idea about the honor days was thrown in, I think, in his objections for the first time. It hasn't been addressed by Mr. Nkuma in his brief other than in a footnote saying, we reserve that issue when it goes back. As I understand what their challenge is, their challenge is to this idea of renunciation and whether this renunciation policy. And that has been the focus of the way this case has been briefed and presented both in the district court and to this court. And so based on that being the way the case has been presented, and that's the issue, if I could just sum up for about 20 seconds. With that being the issue, I believe that Judge Norton and the district court got it absolutely correct that, number one, there are compelling interests of security and maintaining prison, internal prison order, and that we have shown that that is the least restrictive alternative. And what's important with this renunciation policy, as I indicated, it's only one form of someone being able to have the STG status removed. And it's got to be sincere. It's not lip service. It's not simply we want someone to come in and actually just tell us what we want to hear. It has to be sincere and meaningful, and it wasn't directed as any type of religious exercise. We would ask the court to affirm the district court. Thank you. Thank you. Markle? First of all, this is not a facial challenge. There are genuine issues of material fact as to whether Mr. Nkuma is receiving meaningful ongoing review, and on this record, it's not clear that he is. The meaningful review is really key here because, otherwise, this is simply punishment for something that he did 20 years ago. And I think there's also a genuine issue of material fact as to whether they're just simply trying to keep Mr. Nkuma in confinement indefinitely because of his participation in the prison riot in 1995. The prison's policy, SCDC policy opinion 2212, requires that for an inmate to be receiving review under the prison's own procedures, there is a classification hearing, which can be waived by the inmate. But it's not clear. In fact, there's no evidence on this record that shows that Mr. Nkuma ever did waive his opportunity to a classification hearing. And for that and many other reasons, there's a genuine issue of material fact on this record that Mr. Nkuma is getting an opportunity for rebuttal. A rote repetition of the reasons for Mr. Nkuma's continued confinement as being the same reason that he was initially placed in lockdown, effectively eliminates the possibility of any release. And that's something that actually the Fifth Circuit recently found in a case where they did find a liberty interest and a lack of meaningful review. And I just want to jump to the least restrictive means prong, which I didn't address as fully in my opening. The Supreme Court in Hull versus Hobbs made it clear that a mere consideration of alternatives was not sufficient to meet the court required in Holt that the prison give reasons for why they couldn't implement a less restrictive alternative, at least as applied to the inmate there. I mean, in that case, other prison systems had adopted the two photos method of identification. And the Supreme Court said that Arkansas had not shown why they couldn't adopt that as well. I don't have anything comparable in this record about an alternative. A less restrictive alternative. Yes, Your Honor. And Mr. Nkuma has asked that there be an opportunity to renounce violence. And as I stated before, the West Virginia system, which is recognized in a case called Blake versus Perry, has adopted a similar method of allowing inmates to renounce. Okay, he'll be given an opportunity and they don't think he's sincere and that's the end of that. So that doesn't strike me. I mean, maybe that's the least restrictive alternative. Maybe that's all you have. That doesn't strike me as giving him much relief. They're the judge of his sincerity. The difference would be, unlike the less restrictive alternatives the prison has proposed, that Mr. Nkuma would not have to renounce his religion altogether. And in renouncing his religion, be deprived of any religious practice. And so he would much rather have the opportunity to renounce his current dangerousness and to demonstrate that he's been infraction-free. The prison is, I would assume, making the judge about whether that was sincere or not. Yes, the prison would ultimately be making that judgment. But I think that would be a much better fit with their stated objectives of security and it would be much less burdensome on Mr. Nkuma's religious practice. Essentially, prison officials have said that the way that they evaluate members of the Nation of Gods and Earth getting into SMU is by an individualized review of their conduct. But for some reason, prison officials have stated they can't do that same individualized review for letting prisoners out of SMU. And I don't think that, on this record, they have presented sufficient evidence to show that they've met their burden under RLUIPA's strict scrutiny. And are there no further questions? No. Thank you very much. Ms. Markey, Ms. Goblek, we understand that you have been court-appointed, and as usual, you all have done a fine job. We very much appreciate your efforts. Good luck to you in your career. We will come down and greet counsel and then go directly to our next speaker.
judges: Diana Gribbon Motz, Barbara Milano Keenan, Stephanie D. Thacker